UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAYLA SOUTH,

      Plaintiff,                                 Civil No. 09-14740
                                                 Hon. John Corbett O'Meara
          v.                                Magistrate Judge Mark Randon

MIDWESTERN AUDIT SERVICES, INC., and
CONSUMERS ENERGY CO.

      Defendants.

_____/

**OPINION AND ORDER ADOPTING THE MAGISTRATE JUDGE'S
REPORT AND RECOMMENDATION [49]**

Plaintiff Kayla South filed this putative class action alleging that Midwestern Audit

Services, Inc. ("Midwestern") and Consumers Energy Company ("Consumers Energy" or

"Consumers") violated various provisions of the Fair Debt Collection Practices Act ("FDCPA") and

the Michigan Occupational Code by, *inter alia*, failing to include certain consumer protection

language in a letter Midwestern sent to Plaintiff and other Consumers Energy customers.  Presently

before the Court is Plaintiff's Objection (Dkt. 50) to the Magistrate Judge's Report and

Recommendation (Dkt. 49) which recommends that the Court grant Defendants' Motions for

Summary Judgment (Dkts. 30, 38) and deny Plaintiff's Motion for Class Certification (Dkt. 27).

Having thoroughly reviewed the motions and responsive briefing, the Magistrate Judge's Report and

Recommendation ("Report"), Plaintiff's Objection, and Consumers Energy's Response (Dkt. 51),[1]

the Court ADOPTS the Magistrate Judge's Report and OVERRULES Plaintiff's objections.

_____

[1] Defendant Midwestern did not file a response to Plaintiff's Objection.

# I.  FACTUAL BACKGROUND AND PLAINTIFF'S ALLEGATIONS

## A.  Origination of the Debt Transferred to Plaintiff's Consumers Energy Account

As relevant to this suit, Plaintiff has lived with her boyfriend, Jeff Kozlowski, at three residences serviced by Defendant Consumers Energy, a Michigan public utility.  (Dkt. 30, Ex. 3, South Dep. 10:2-13:12.)  From the middle of 2007 until mid-to-late 2008,[2] the couple resided on Loxley Road in Houghton Lake, Michigan.  (South Dep. 41:25-42:3.)  At that address, Kozlowski held a Consumers Energy account for electric service in his name.  He failed to pay off a $321.11 balance on that account prior to moving.  (Dkt. 44, Pl.'s Resp. Consumers' Mot. at 3; Vaughn Aff. ¶ 2.)

In mid-to-late 2008, Plaintiff and Kozlowski moved to a second residence in Houghton Lake, this one located on Westshore Drive.  During 2009 Kozlowski received six letters from Defendant Midwestern, a debt collection company under contract with Consumers, regarding the outstanding Consumers Energy balance from the Loxley Road residence.  (Dkt. 38, Ex. 6, Vaughn Aff. ¶ 2.)  In September 2009, Kozlowski paid Midwestern $50.00 of this debt, and Midwestern set up a payment plan for the remaining $271.11.  (*Id.*)  Under the plan, Kozlowski's first payment was due on October 11, 2009.  (*Id.*)

Prior to the first-payment due date, however, Kozlowski moved from Houghton Lake to Vermont Avenue in Royal Oak, Michigan.  (*See* South Dep. 52:19-53:4; Dkt. 38, Ex. 4,

---

[2] More precisely, Plaintiff moved out of the Loxley Road residence in June 2008, but remained on the lease until "around" October 2008.  (*See* South Dep. 19:8-14, 68:25-70:11.)  It appears that Kozlowski remained at the Loxley residence until October 2008.  (South Dep. 58:9-13.)  Plaintiff asserts that because of her move-out date she is not even partially responsible for the Consumers Energy debt from the Loxley Road address.  (South Dep. 18:12-19:14.)  Whether Plaintiff is responsibile for the account is not material to the resolution of the FDCPA claims before the Court.

Midwestern's Resp. to Pl.'s First Interrog. #8.) Plaintiff joined Kozlowski at the Royal Oak residence a few weeks later, sometime in October 2009. (South Dep. 52:19-53:4.) Shortly thereafter, on November 2, 2009, Plaintiff received the letter precipitating this suit; it notified her that the $271.11 balance on Kozlowski's former Consumers Energy account would be transferred to her new Royal Oak account unless she disputed the transfer within ten days.

### B. Midwestern's Involvement in the November 2, 2009, Letter Notifying Plaintiff that Debt Would Be Transferred to Her Consumers Energy Account

Consumers Energy occasionally enters into agreements with licensed debt collection agencies that assist in collecting unpaid utility bills such as Kozlowski's. (Consumers' Mot. at 4.) One such agreement is the "Collection Service Agreement" ("Agreement") between Midwestern and Consumers. Under the Agreement, once a month, Consumers Energy provides Midwestern with a set of accounts that Consumers has "determined to be uncollectible." (Dkt. 44, Pl.'s Resp. to Consumers' Mot., Ex. 6, Agreement § B1). Once received, "[Midwestern] . . . take[s] appropriate action in an attempt to collect all accounts so referred to it, including at least two collection letters and two telephone attempts within a 45 day period." (Agreement § B2.) As particularly pertinent to the instant dispute, the Agreement also provides that Midwestern will transfer certain balances between Consumers Energy accounts. (Agreement § B3.) Specifically, the transfer provision of the Agreement provides:

> When, in the course of collecting energy accounts, [Midwestern] finds that the debtor is using gas and/or electric service on Consumers' lines under a new (different) account number, [Midwestern] shall transfer the debt onto Consumers' records to such new using account, and enter on the account file of the old account that the debt has been so transferred. Such transfer of a debt to a new using account and cessation of collection on the old account shall be done only in cases where the service under the new account is of the same class . . . as the service which gave rise to the debt under the old

3

account and the debt is not in dispute.

(Agreement § B3.)  Mary Eimer, a Consumers Senior Business Support Consultant who is responsible for Consumers' "uncollectible losses," testified that it is Midwestern's duty to identify if a particular debt should be transferred, and, once identified, it is Midwestern that accesses Consumers' computer system to transfer the outstanding balance to the appropriate Consumers Energy account.  (Dkt. 44, Ex. 7, Eimer Dep. 9:8-10:9, 132:19-134:3.)

The Agreement also provides that Consumers Energy will compensate Midwestern in the following manner: 25% of any amount of debt collected, 45% of any amount of debt collected through the use of Midwestern's attorney(s), and—most relevant for instant purposes—10% of any amount transferred.   (Agreement § B7.)  Midwestern is paid once it completes the transfer on Consumers Energy's computer system, regardless of when, or if, Consumers ultimately collects from the customer.  (Eimer Dep. 134:4-19, 202:19-203:20; *see also* Agreement §§ B3, B7.)

In the case of Plaintiff and Kozlowski, Midwestern was able to determine that it was appropriate to transfer the debt from Kozlowski's Consumers Energy account to Plaintiff's through an investigatory process known as "skip tracing."  When Kozlowski moved to Royal Oak in September 2009, he was told by Consumers Energy that he could not turn on service in his name because of the outstanding $271.11 balance on his Consumers' account.  (South Dep. 53:5-20.)  So Plaintiff, although she was not yet living at the Royal Oak address, opened a Consumers account for gas in her name on September 23, 2009.  (South Dep. 53:5-12 (explaining that gas service was put in her name prior to moving so Kozlowski "could have heat while it was cold outside").)  On that same day, apparently because the couple's bills were generally paid by Kozlowski, Kozlowski requested electric service in his name from a different utility.  (South Dep. 10:16-21; Dkt. 38, Ex.

4, Midwestern's Resp. to Pl.'s First Interrog. #8.) Two days later, Midwestern discovered Kozlowski's September 23, 2009, turn-on request and was thus able to determine Kozlowski's new Royal Oak address. (Midwestern's Resp. to Pl.'s First Interrog. #8.) This triggered Midwestern to investigate whether there was Consumers Energy service at that address, which in turn revealed that Plaintiff had opened a gas account there. (*Id.*) Using Lexis Nexis, Midwestern next discovered that Plaintiff had received mail at the Loxley Road address at the time Kozlowski held a Consumers Energy account there. Midwestern, quite logically, deduced that Plaintiff lived with Kozlowski when the Consumers debt had originally incurred. (*Id.*) In sum, given that Kozlowski and Plaintiff requested utility services at their Royal Oak residence, combined with the fact that Plaintiff had lived with Kozlowski at the Loxley Road address, Midwestern concluded that transferring Kozlowski's debt to Plaintiff's Royal Oak account was proper. (*See id.*)

**C. The November 2, 2009, Letter Sent By Midwestern To Plaintiff**

After completing its skip-tracing investigation, on November 2, 2009, Midwestern sent Plaintiff the letter that precipitated this suit ("South Letter"). (Midwestern's Resp. to Pl.'s First Interrog. #8; Pl.'s Resp. to Midwestern's Mot., Ex 2.)[3] The South Letter appears on Midwestern letterhead that reads "Midwestern Audit Services, Inc." in large letters with Midwestern's address in smaller letters immediately below. The body of the South Letter states in full:

---

[3] A copy of the South Letter, complete with Midwestern's letterhead, is Exhibit 1 to this Opinion and Order.

November 2, 2009

943589
KAYLA SOUTH
[STREET NO.] VERMONT AVE
ROYAL OAK MI 48703

Consumers Energy
Consumers Energy Acct. #:          [South's Royal Oak Acct. No.]
Current Service Address:            [Street No.] VERMONT AVE
                                   ROYAL OAK MI 48703

Dear KAYLA SOUTH,

A recent review of your records indicates an outstanding balance for the account(s) below:

| Account Number: | Amount: | Service Address: |
| --- | --- | --- |
| [Kozlowski's Loxley Acct. No.] | $271.11 | [Street No.] LOXLEY RD |
| | | HOUGHTON LAKE MI |
| | 48629 | |

For Your convenience in making payment, this amount will be transferred in ten (10) days
to your present account and will appear as a previous balance on your next monthly billing.

**SHOULD YOU HAVE ANY QUESTIONS CONCERNING THIS MATTER, PLEASE
CONTACT OUR OFFICE AT 1-877-777-0342.**

Sincerely,

Midwestern Audit Services, Inc
Consumers Energy

(Pl.'s Resp. to Midwestern's Mot., Ex 2.)

Upon receiving this letter, Plaintiff took two actions: she called Consumers Energy about the transfer and sent Midwestern a "cease and desist" letter. Plaintiff explained that she called Consumers rather than (as directed by the letter) Midwestern, because "Consumers was the one I have my . . . account with." (South Dep. 30:2-24.) During the call, Consumers Energy informed Plaintiff that they had the right to transfer the debt ("they could do whatever they want"), and explained "whose [balance] it was, where it was coming from and why it was being put onto [Plaintiff's] account." (*Id.*) After her call with Consumers Energy, Plaintiff asked Kozlowski about the letter; it was at that time that she first learned that Midwestern was a debt collector. (South Dep. 31:15-32:10.)

In a letter dated November 10, 2009, Plaintiff, using language from a form letter provided by her attorney, requested that Midwestern "cease and desist calling me." (South Dep. 16:3-19, 44:19-45:11.) Plaintiff admitted, however, that Midwestern never called her regarding the transferred debt, nor did she receive any letter from Midwestern other than the November 2, 2009, letter. (South Dep. 14:8-12, 16:24-17:8, 21:7-14.) A certificate of mailing provided by Plaintiff indicates that while her cease and desist letter was sent to Midwestern on November 10, delivery was not completed until November 13, 2009. (Pl.'s Resp. to Consumers' Mot., Ex. 2.)[4]

On November 12, 2009, Midwestern transferred the $271.11 balance from Kozlowski's account to Plaintiff's Royal Oak account. (Pl.'s Resp. to Consumers Mot., Ex. 3; Dkt. 16, Am. Compl. ¶ 22.) Sometime in late November or early December 2009, Plaintiff received a gas bill from Consumers Energy. (*Id.*) That bill provided that for the period October 21, 2009, through November 19, 2009, Plaintiff owed $55.19 for gas use at the Royal Oak residence. (*Id.*) It also provided, in a section labeled "Account Status," that $271.11 had been transferred to Plaintiff's account on November 12, 2009. (*Id.*) Plaintiff's bill, however, did not demand that Plaintiff immediately pay the $271.11; rather, it stated that the "total current bill due on or before 12/16/2009" was $55.19—the amount owed for gas use. (*Id.*)

In a subsequent "Shut-Off Notice for Nonpayment" dated December 24, 2009, Consumers Energy informed Plaintiff that unless she paid the $271.11 balance, her Royal Oak Consumers services would be shut off on or after January 10, 2010. (Pl.'s Resp. to Consumers Mot., Ex. 4.)

---

[4] Plaintiff objects to the Magistrate Judge's finding that Plaintiff took no other steps to dispute the debt. (Report at 5; Pl.'s Obj. at 2-3.) Plaintiff has not adequately explained, nor pointed to any evidence demonstrating how this factual finding is inaccurate, however. Further, whether Plaintiff took additional steps to dispute the transferred balance is largely immaterial to the resolution of this case. The Court will not address this objection further.

In response to this shut-off notice, Plaintiff's mother paid the outstanding balance and Plaintiff subsequently reimbursed her. (South Dep. 57:14-16, 62:11-63:11.)

### D. Plaintiff's Allegations

On December 7, 2009, Plaintiff initiated this putative class action "for damages and injunctive relief based upon Defendants' violations of the Fair Debt Collection Practices Act . . . and the Michigan Occupational Code." (Dkt. 16, Am. Compl. at 1.) In particular, Plaintiff alleges that Defendants have violated the following provisions of the FDCPA, 15 U.S.C. § 1692 *et seq.*: section 1692d (harassing or abusive debt collection practices); section 1692e (false and deceptive representations in the collection of a debt); section 1692f (unfair or unconscionable means to collect a debt); section 1692g (required written notices to consumers, including, a notice that after thirty-days debt will be assumed valid); section 1692j (furnishing deceptive forms). (Am. Compl. ¶¶ 43a-f.)

Plaintiff has also alleged violations of state law. In particular, the Amended Complaint asserts that Defendants have violated the following provisions of the Michigan Occupational Code, Mich. Comp. Laws § 339.901 *et seq.*: section 339.915(a) (communicating with a debtor in a misleading or deceptive manner); section 339.915(e) (misleading or deceptive statement in a communication to collect a debt); section 339.918 (required written notices to consumer, including, statement that after thirty-days debt will be assumed valid). (Am. Compl. ¶¶ 44a-d.)

## II. THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Relying primarily on *Mabbitt v. Midwestern Audit Serv., Inc.*, No. 07-11550, 2008 WL 723507 (E.D. Mich. Mar. 17, 2008), the Magistrate Judge concluded that Defendants' Motions for Summary Judgment should be granted and that this case be dismissed with prejudice because the

South Letter was not, as the relevant provisions of FDCPA require, sent "in connection with the collection of any debt." (Dkt. 49, Report at 2, 6.) As will be discussed, *Mabbitt* involved a suit brought against Midwestern alleging that a letter very similar to the South Letter violated the FDCPA. Noting that the South Letter was "nearly identical" to the *Mabbitt* letter, with two minor, "immaterial" differences, the Magistrate Judge concluded that "reasoning articulated in *Mabbitt* applies squarely to the present case." (Report at 8.) Accordingly, the Magistrate Judge recommended that Defendants' Motions for Summary Judgment be granted.

Alternatively, the Magistrate Judge recommended that the FDCPA claims against Consumers Energy should be dismissed on the grounds that Consumers Energy is not a "debt collector" within the meaning of the Act. (Report at 11-12.)

Because the Magistrate Judge concluded that dismissal of the FDCPA claims was warranted, he further recommended that the Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims, and that Plaintiff's Motion to Certify Class be denied. (Report at 6, 15.)[5] He also noted that it was "a very close call" as to whether Plaintiff's counsel should be sanctioned pursuant to 28 U.S.C. § 1927, but ultimately recommended that this Court not impose sanctions on Plaintiff's counsel. (Report at 13-14.)

---

[5] Plaintiff has objected to the Magistrate Judge's recommended grant of summary judgment on Plaintiff's FDCPA claims. However, Plaintiff has not alternatively objected that if this Court agrees with the Magistrate Judge on the resolution of the FDCPA claims that the putative plaintiff class should be certified or that this Court should retain jurisdiction over her state law claims. (Neither Defendant has objected to this Court declining to exercise supplemental jurisdiction over the state law claims.) Because the Court agrees with the Magistrate Judge that summary judgment is warranted on Plaintiff's FDCPA claims, it will not revisit the Magistrate Judge's unobjected-to conclusions on class certification and dismissal of state law claims. *See Thomas v. Arn*, 474 U.S. 140, 149-50 (1985).

## III. ANALYSIS OF PLAINTIFF'S OBJECTIONS

### A. Legal Standards

#### 1. Standard of Review of a Magistrate Judge's Report and Recommendation

The filing of timely objections to a magistrate judge's report and recommendation requires the district court to "make a *de novo* determination of those portions of the report or specified findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In completing its *de novo* review, this Court re-examines all the relevant evidence previously reviewed by the magistrate judge to determine whether the recommendation should be accepted, rejected, or modified in whole or in part. 28 U.S.C. § 636(b)(1). The Court, however, "is not required to articulate all of the reasons it rejects a party's objections." *Thomas v. Halter*, 131 F. Supp. 2d 942, 944 (E.D. Mich. 2001) (citations omitted); *see also Tuggle v. Seabold*, 806 F.2d 87, 92 (6th Cir. 1986). Further, "section 636(b)(1) does not on its face require any review at all, by either the district court or the court of appeals, of any issue that is not the subject of an objection." *Thomas v. Arn*, 474 U.S. 140, 149 (1985).

#### 2. Summary Judgment Standard

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material only if it might affect the outcome of the case under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). On a motion for summary judgment, the court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. Ultimately, the Court must determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to a jury or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *Anderson*, 477 U.S. at 252.

**B. The South Letter Was Not Sent "In Connection With The Collection Of Any Debt"**

Plaintiff alleges that Defendants have violated multiple provisions of the FDCPA; specifically, 15 U.S.C. §§ 1692d, e, f, g, and j. Each of these provisions, save perhaps section 1692j, which will be discussed separately, requires that a communication to the debtor be an attempt to collect a debt before it falls within the scope of the FDCPA.[6] Defendants assert that the South Letter was simply a notification that a balance was going to be transferred, and thus was not sent "in connection with the collection of any debt." Accordingly, Defendants argue, the South Letter is outside the FDCPA's purview and summary judgment is therefore warranted. The Court agrees.

---

[6] Sections 1692d, e, and g use the phrase "in connection with the collection of any debt" whereas 1692f uses the similar language "to collect or attempt to collect any debt." None of the parties have argued that 1692f should be analyzed separately from the other three provisions. Likewise, no party has objected to the Magistrate Judge's grouping of these four provisions for purposes of determining whether the letter was sent an attempt to collect a debt. Further, in a highly-analogous situation, this district analyzed 1692f under the same rubric as the other three provisions. *Mabbitt v. Midwestern Audit Servs., Inc.*, No. 07-11550, 2008 WL 723507 (E.D. Mich. Mar. 17, 2008) (explaining that "§ 1692f uses slightly different language to convey the same idea [as sections 1692d, e, and g], as it applies to the means used 'to collect or attempt to collect any debt.'"). The Court finds *Mabbitt* persuasive on this point and proceeds accordingly.

Although the parties have rightfully focused their fire on the *Mabbitt* case—a case from this district analyzing, on strikingly similar facts, the FDCPA language presently at issue—the Court has reviewed a number of other cases analyzing whether a letter from a debt collector was sent "in connection with the collection of any debt." Before turning to the *Mabbitt* case, the Court will briefly discuss two of these cases that are particularly helpful in resolving the case at hand.

In *Bailey v. Sec. Nat'l Servicing Corp.*, the Seventh Circuit held that a letter informing the plaintiffs about upcoming payments under a mortgage-loan forbearance agreement was not a communication "in connection with the collection of any debt." 154 F.3d 384, 387 (7th Cir. 1998). The plaintiffs in *Bailey* had defaulted on their original mortgage loan but subsequently entered into a forbearance agreement which temporarily superseded the default. *Id.* at 386. Their loans were eventually sold, and shortly thereafter, the new loan servicer sent the plaintiffs the letter that triggered the FDCPA suit. *Id.* The letter informed the debtors that under the forbearance agreement $551.00 was due within a week and advised them of three other upcoming payment due dates. *Id.* It also stated:

> "We wish to work with you on the resolution of your delinquency and will allow you to continue to make the payments remaining under this agreement. However, sending less than the forbearance payment amount and late payment of your monthly installment may render this agreement null and void requiring immediate payment in full of all sums due under the terms of your Note."

*Id.*

In holding that the letter did not fall within the strictures of the FDCPA, the *Bailey* court focused on the fact that the letter did not "demand any payment whatsoever." *Id.* at 389. It instead informed the plaintiffs of "'the current status' of their account." *Id.* Further, the court explained that to the extent that the letter warned that a failure to make timely payments would void the

forbearance agreement, "[a] warning that something bad might happen if payment is not kept current is not a dun, nor does it seek to collect any debt, but rather the opposite because it tries to prevent the circumstance wherein payments are missed and a real dun must be mailed." *Id.*

In a recent case, the Seventh Circuit clarified its holding in *Bailey* and held that a letter from a mortgage loan servicer in an attempt to induce a mortgagor to settle her defaulted loan was "sent in connection with an attempt to collect a debt." *Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 382 (7th Cir. 2010). In *Gburek*, a letter from the servicer requested that the borrower provide her contact information along with "extensive financial information, including her monthly income and expenses, her assets and liabilities, her most recent pay stubs and tax returns, and recent bank statements for her checking and savings accounts." That letter also warned,

> "we would like to emphasize that it is not too late to save your home. Options may be available to help preserve your homeownership. To determine options that best fit your financial situation, you must complete and return the enclosed form and provide the requested documentation to [our Loss Mitigation Department] within 14 business days. . . .
>
> "[We] will not delay ongoing legal action on your home until your financial information has been received and processed."

*Id.*

In finding that the complaint pled sufficient facts to infer that the letter was sent "in connection with an attempt to collect a debt," the Seventh Circuit rejected the district court's bright-line rule that omitting a demand for payment necessarily means a letter was not an attempt to collect a debt. In particular, the *Gburek* court noted that although there was no explicit demand for payment, the mortgagor was already in default on the loan, the letter requested the mortgagor's financial information, and, in all, the communication could reasonably be characterized as an

attempt to collect on the defaulted loan "by settlement or otherwise." *Id.* at 386. Accordingly, the Seventh Circuit held that the district court's Rule 12(b)(6) dismissal was improper. *Id.*

Although neither *Bailey* nor *Gburek* are binding on this Court, those cases provide the following helpful guidelines. First, it is clear that not all communications from a debt collector to a debtor will trigger the technical mandates of the FDCPA. *Gburek*, 614 F.3d at 384-85; *see also Bailey*, 154 F.3d at 389. Second, the absence of a demand for payment is a critical factor in determining whether a communication is an attempt to collect a debt. *See Bailey*, 154 F.3d at 389; *Gillespie v. Chase Home Finance, LLC*, No. 3:09-CV-191, 2009 WL 4061428, at *5 (N.D. Ind. Nov. 20, 2009) (finding letter was not sent in connection with the collection of a debt where "the letters . . . did not provide terms of payment or deadlines, threaten further collection proceedings, or demand payment in any form."). However, such an omission is not always dispositive: a court should also be mindful of a communication's "purpose and context" and make a "commonsense inquiry" of whether the communication falls within the purview of the FDCPA. *Gburek*, 614 F.3d at 385. Finally, on summary judgment, the Court is to treat the question as one of objective fact—as opposed to applying the least-sophisticated consumer standard—and must therefore determine whether a reasonable jury could find that a communication was sent "in connection with the collection of any debt." *Ruth v. Triumph P'ships*, 577 F.3d 790, 798 (7th Cir. 2009) (holding that whether a communication "is in connection with the collection of a debt" "is a question of objective fact, to be proven like any other fact," as opposed to taking the least-sophisticated debtor's point of view); *see also Gburek*, 614 F.3d at 385; *Grden v. Leikin, Ingber & Winters, P.C.*, No. 09-10579, 2010 WL 199947, at *7-8 (E.D. Mich. Jan. 19, 2010) (adopting the objective standard set forth by the Seventh Circuit in *Ruth*).

Beginning with the content of the South Letter, it is critical to note that it makes no demand for payment. Although the letter states, "[f]or [y]our convenience in making payment, [the above] amount will be transferred in ten (10) days to your present account," it does not set a deadline for when the transferred balance must be paid, nor does it otherwise attempt to provide a payment schedule. Further, it does not warn that any adverse consequences will result from a failure to pay. And while the letter instructs, "should you have any questions concerning this matter, please contact [Midwestern's] office," it does not propose any settlement plan nor solicit the recipient to contact Midwestern (or Consumers Energy) to negotiate a settlement. In fact, the South Letter is in stark contrast with the letter at issue in *Gburek*, which solicited "extensive" financial information, warned of foreclosure, and urged the recipient to engage in settlement discussions with the loan servicer. *Gburek*, 614 F.3d at 382. Rather, it is more akin to the informational account-status letter in *Bailey* which made no demand for payment. *Bailey*, 154 F.3d at 386; *see also Gillespie*, 2009 WL 4061428, at *5. Based on the content of the letter alone, it would be unreasonable for a jury to conclude that the South Letter was an attempt to collect a debt.[7]

Considering the purpose behind the South Letter only strengthens this conclusion. Viewed objectively, the letter's purpose was to inform Plaintiff about a balance transfer before it suddenly appeared on her next Consumers Energy bill. Indeed, the South Letter provides the recipient with a ten day window to call Midwestern and dispute the transfer before it occurs; and, under the

---

[7] It is also helpful to juxtapose the South Letter with the December 24, 2009, "Shut-Off Notice for Nonpayment" sent by Consumers Energy. The latter communication warned Plaintiff that unless she paid the $271.11 balance, her Consumers Energy gas service would be shut off on or after January 10, 2010. (Dkt. 44, Pl.'s Resp. to Consumers' Mot., Ex. 5.) It also admonished, in large, bold lettering, that the recipient should "PAY NOW $271.11" to avoid paying $406.11 "AFTER shut-off." (*Id.*) The "Shut-Off Notice for Nonpayment" was much more of a dun than the South Letter.

Agreement between Midwestern and Consumers, Midwestern may not complete disputed transfers. The informational nature of the South Letter is also supported by the compensation system set forth in the Agreement. Unlike other tasks that Midwestern performs on Consumers Energy's behalf, Midwestern is paid for transferring the balance—regardless of whether the transferee ultimately pays Consumers Energy. It would be unreasonable to conclude that Midwestern intended to dun a letter recipient into disputing a debt when such an act would jeopardize its transfer compensation.

Finally, the context in which the South Letter was sent does not alter the finding that it would be objectively unreasonable to classify the letter as an attempt to collect a debt. Although Kozlowski had received numerous letters from Midwestern regarding his outstanding Consumers Energy balance, Plaintiff admitted that beyond the November 2, 2009, letter, Midwestern never contacted *her*—by phone or otherwise. Indeed, Plaintiff explained that she did not know Midwestern was a debt collector until after she contacted Consumers Energy about the November 2, 2009, letter and then discussed the letter with Kozlowski. The fact that Plaintiff was contacted only once, viewed in light of the FDCPA's purpose of preventing abusive, harassing conduct on the part of debt collectors, further supports a finding that the South Letter was not an attempt to collect a debt within the meaning of the Act.

The Court finds additional support in another decision of this district involving nearly identical facts: *Mabbitt v. Midwestern Audit Serv., Inc.*, No. 07-11550, 2008 WL 723507 (E.D. Mich. Mar. 17, 2008). An extended discussion of *Mabbitt* is unnecessary given the parties' familiarity with the case[8] and the Magistrate Judge's recitation in his Report. Suffice it to say that

---

[8] South's counsel and Midwestern's counsel also litigated the *Mabbitt* case.

*Mabbitt* involved a virtually identical letter sent by Midwestern as the one at issue in this case.[9] And the events in *Mabbitt* that culminated in sending the letter are also analogous to this case: the plaintiff and her sister lived at one address where Consumers Energy debt accrued, moved to a second residence where Consumers Energy "would not likely allow service" in the debtor's name, and an account was thus opened in the non-debtor's name. *Id.* at *1-2. In granting summary judgment on the plaintiff's FDCPA claims in favor of defendant Midwestern, Judge Edmunds found that the letter was not, as a matter of law, "in connection with the collection of any debt." Specifically, she explained that the

> letter makes no demand or attempt to obtain payment of a debt. Instead, it notifies [its recipient] that an outstanding balance has been transferred to her new account. And while the letter states that the transfer was made for her "convenience in making payment," it contains no language that she is required to pay the debt.

*Id.* at *4. The Court agrees with the reasoning of *Mabbitt* and finds that is directly applicable to this case.

In her Objection, Plaintiff argues that the following testimony from Mary Eimer, a 28-year Consumers Energy employee familiar with Midwestern's agreement with Consumers and responsible for Consumers' "uncollectible losses," distinguishes this case from *Mabbitt*:

| | |
|---|---|
| PLAINTIFF'S ATTORNEY: | So [the South Letter is] not a notification of transfer? |
| CONSUMERS' ATTORNEY: | OBJECTION |
| PLAINTIFF'S ATTORNEY: | Or it is a notification of transfer? |
| MS. EIMER: | No. |

(Pl.'s Obj. at 2 (quoting Eimer Dep. 136:21-25).) Plaintiff claims that the Magistrate Judge erred

---

[9] The *Mabbitt* letter is Exhibit 2 to this Opinion and Order.

in concluding that the South Letter was not an attempt to collect a debt when "the person in charge of the whole collection department at Consumers states they are not notification of transfer letters." (Pl.'s Obj. at 2.)  The Court disagrees with Plaintiff that the Magistrate Judge so erred.

First, Eimer's testimony is, at best, equivocal on this point.  In at least three other places in her testimony she refers to the South Letter as a notice-of-transfer letter or otherwise describes its purpose as such.  (Eimer Dep. 18:20-20:18 ("It would be a transfer letter."); 118:19-119:12 ("Ten-day letters are sent in advance to give customers opportunities to call and let them know that you have got the wrong person"); 206:19-207:1 (agreeing that the "goal" of both the *Mabbitt* letter and South Letter was to transfer an amount owed).)  Second, it is not clear that Eimer's statement was made in the context of the FDCPA, let alone in reference to its "in connection with the collection of any debt" language.

Even ignoring the forgoing two points, and taking all reasonable inferences in favor of Plaintiff, Eimer's characterization ultimately has little impact on the Court's analysis.  Viewed differently, if *Plaintiff* had testified that the South Letter *was* a notice-of-transfer letter as opposed to an attempt to collect a debt, such an admission would not bar her FDCPA claims.[10]  Rather, the question remains one of objective fact and the subjective characterizations of a debt collector or a debtor are not particularly material.  *Cf. Lewis* , 135 F.3d at 399 (noting that "the mere fact that the letter states at the bottom that it 'is an attempt to collect a debt' does not transform the letter into an unlawful demand for payment."); *Gburek*, 614 F.3d at 386 n.3 ("The letter bore a disclaimer identifying it as an attempt to collect a debt, but this does not automatically trigger the protections

---

[10] In fact, Plaintiff acknowledged that the South Letter merely stated an outstanding balance would be transferred to her account, and agreed that the letter did not say that Midwestern was attempting to collect a debt.  (South Dep. 32:11-22.)

of the FDCPA, just as the absence of such language does not have dispositive significance.").

Because it would be unreasonable for a jury to conclude that the South Letter was sent "in connection with the collection of any debt," the Court holds as a matter of law that Defendants have not violated 15 U.S.C. §§ 1692d, e, f, or g.

### C. Midwestern Did Not Engage in "Flat Rating" in Violation of 15 U.S.C. § 1692j[11]

In her Response to Midwestern's Motion, and again in her Objection, Plaintiff argues that Midwestern engaged in "flat-rating"—a practice prohibited by 15 U.S.C. § 1692j(a). (Pl.'s Resp. Midwestern's Mot. at 11-16; Pl.'s Obj. at 16-19.) In his Report, the Magistrate Judge rejected Plaintiff's characterization that Midwestern was a "flat-rater" because "it was Midwestern's

---

[11] As the Magistrate Judge suggested, it is arguably unnecessary to separately address Plaintiff's claim that Defendant Midwestern has violated 15 U.S.C. § 1692j. (*See* Report at 6 n.3 (finding Plaintiff's section 1692j argument "unpersuasive[]" in part because the South Letter "was not a debt collection letter").) While section 1692j does not use the language "in connection with the collection of any debt," it contains the debatably similar phrase "in the collection of or in an attempt to collect a debt." Because, as just discussed, the South Letter was not an attempt to collect a debt, it is possible that the letter falls outside the scope of 15 U.S.C. § 1692j. *Cf. Mabbitt*, 2008 WL 723507, at *3 (explaining that while "§ 1692f uses slightly different language" from the other FDCPA provisions that use "in connection with the collection of any debt," the language in section 1692f—"to collect or attempt to collect any debt"—similarly did not encompass notice-of-transfer letters).

On the other hand, section 1692j prefaces the phrase in question with a reference to "a consumer." *Compare* 15 U.S.C. § 1692j(a) ("It is unlawful to . . . furnish any form knowing that such form would be used to create the false belief in *a consumer* that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt . . . ." (emphasis added)) *with* 15 U.S.C. § 1692e ("A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt."). Thus, the provision may contemplate a least-sophisticated-consumer standard rather than the objective standard used in determining whether a communication is "in connection with the collection of any debt."

Ultimately, the Court declines to place unnecessary judicial gloss upon 15 U.S.C. § 1692j. As will be discussed, even assuming that the disputed material facts will fall in Plaintiff's favor at trial, and that the South Letter created, in the least-sophisticated consumer's eyes, the belief that a third-party was "participating in the collection of or in an attempt to collect a debt," it is clear that this belief was not false as Midwestern was substantially involved in sending the South Letter.

independent audit that identified Plaintiff as a responsible party for the outstanding Consumers Energy debt."  (Report at 6 n.3.)  The Court agrees with the Magistrate Judge that Midwestern's investigation is a material fact not in dispute, and that Midwestern's participation removes its conduct from the strictures of 15 U.S.C. § 1692j(a).

In the FDCPA context, the classic "flat rater" is a debt collector who sells his letterhead to a creditor for a fixed per-letter fee (i.e., flat rate), but is not otherwise involved in the collection of the creditor's debts.  *Nielsen v. Dickerson*, 307 F.3d 623, 633 (7th Cir. 2002); *Sokolski v. Trans Union Corp.*, 53 F. Supp. 2d 307, 312 (E.D.N.Y. 1999).  Congress prohibited this practice because it creates the "inherently deceptive impression that there is a third party engaged in the collection of the debt when, in fact, that party is doing nothing more that selling a set of letters."  *Sokolski*, 53 F. Supp. 2d at 312 (internal quotation marks and citation omitted); *accord* S. Rep. No. 95-382, at 5 (1977), *reprinted in* 1977 U.S.C.A.N.N. 1695, 1699.  Specifically, the relevant provision of the FDCPA makes it unlawful to

> design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating.

15 U.S.C. § 1692j(a).

As the above statutory language makes plain, and as federal courts have held, the FDCPA's flat-rating prohibition is limited to preventing the deceptive suggestion that a debt collector is participating in the collection of a debt "when *in fact* such person is not so participating."  15 U.S.C. § 1692j(a) (emphasis added); *accord Nielsen*, 307 F.3d at 639 (explaining that 1692j bars the practice "in which an individual sends a delinquency letter to the debtor portraying himself as a debt

collector, when in fact he has no real involvement in the debt collection effort"); *Sokolski*, 53 F. Supp. 2d at 312 (describing a flat-rater as one who "is not actually involved in the collection of the creditor's debts, but merely sells the creditor collection letters").

In this case, Midwestern is not a classic flat-rater: it does not merely sell its letter-head to Consumers for a fixed per-letter fee. This fact notwithstanding, Plaintiff suggests that the Magistrate Judge erred by failing to recognize that Midwestern had no real involvement with the South Letter and it was Consumers that, in effect, "had complete control of the letters that went out to Michigan debtors." (*See* Pl.'s Obj. at 13; *see also* Pl.'s Obj. at 14-15, 17-19.) Plaintiff claims that "Midwestern had no authority to negotiate a settlement with a consumer" and could not offer South Letter recipients a payment plan. (Pl.'s Resp. to Midwestern's Mot. at 8, 14; *see also* Eimer Dep. 159:2-21.) Additionally, Plaintiff explains that Consumers, through Eimer, (1) directed Midwestern to omit language that would cause a South Letter recipient to dispute the transfer; (2) educated Midwestern about how to conform transfer letters to comply with state-laws; and (3) reviewed and approved Midwestern's transfer-letter drafts. (Pl.'s Obj. 3-6, 14-19; Pl.'s Resp. to Consumers' Mot., Ex. 8; *see also*, Eimer Dep. 37:6-12, 83:17-86:10.)

Even assuming that a reasonable jury would conclude that Midwestern had no authority to negotiate with South Letter recipients, and that Consumers essentially drafted the content of the South Letter, the Court cannot agree with Plaintiff that Midwestern "appeared to do no more than put an address and an amount alleged due on its letterhead and send it to Plaintiff South and those similarly situated." (Pl.'s Resp. to Midwestern's Mot. at 14.) Such a finding requires that the Court ignore substantial uncontroverted evidence of Midwestern's involvement.

Critically, it is undisputed that it was Midwestern—not Consumers—that performed the skip-

tracing analysis. Through this investigation Midwestern uncovered (1) Kozlowski's electric turn-on request from a non-Consumers Energy utility at the Royal Oak residence; (2) Plaintiff's gas turn-on request from Consumers at the Royal Oak residence; and (3) that Plaintiff had lived with Kozlowski at the Loxley Road address during the year in which the Consumers Energy debt accumulated. In addition, as Plaintiff herself points out, the South Letter informed its recipient to contact Midwestern with questions regarding the potential transfer, and it follows that it was Midwestern that handled any calls to the listed number. Finally, it is an uncontroverted fact that if a transfer was not disputed, it was Midwestern that accessed Consumers Energy's computer system and transferred the debt from one Consumers Energy account to another. In sum, Midwestern determined whether it was appropriate to send a letter and to whom, sent the letter, was ready to handle any possible dispute about the transfer, and, if undisputed, transferred the balance to the letter recipient's account. This substantial participation in the transfer process places Midwestern outside the scope of 15 U.S.C. § 1692j(a). *See Mazzei v. Money Store*, 349 F. Supp. 2d 651, 659 n.6 (S.D.N.Y. 2004) (finding debt collector's involvement sufficient to avoid flat-rating where creditor and collector jointly created the dunning letter, the collector "performed administrative services for [the creditor]," and the collector "played a minimal role in handling responses to the . . . letters").

Plaintiff asserts that *Nielsen v. Dickerson*, 307 F.3d 623 (7th Cir. 2002) is "fitting here" and dictates a contrary result. (Pl.'s Resp. to Midwestern's Mot. at 11-12; Pl.'s Resp. to Consumers' Mot. at 10.) In *Nielsen*, the Seventh Circuit held that a debt collecting law firm that sent out dunning letters on behalf of a credit card servicer was liable under the FDCPA for creating the false impression that attorneys had exercised their professional judgment regarding the validity of the

cardholder's debt.[12]  *Id.* at 635, 639.  Upon receiving a batch of accounts from the credit card

company, the debt collecting law firm in *Nielsen* would perform a number of ministerial tasks before

forwarding a list of accounts to a printing company that ultimately mailed the dunning letter.  These

tasks included, scanning the data provided by the credit card company for obvious errors, making

"sure that duplicate letters were not sent to the same debtor," checking "the data against an inhouse

database of recent bankruptcy declarations," and flagging "debtors who lived in one of three

'prohibited' states . . . to which [the firm] did not send letters."  *Id.* at 627.  And, after sending the

letters, the firm had little participation in actually collecting the debt: it essentially forwarded the

cardholder's responses to the credit card company.  *Id.* at 629-30.  The court, reasoning that the law

firm "did not make an individualized assessment of the status or validity of the debt or the propriety

of sending delinquency letters to the account debtors," held that the firm did not meaningfully

participate in the credit card company's debt collection efforts and was liable for creating the false

impression that it had.  *Id.* at 627, 639.

　　*Nielsen* is largely inapposite.  As an initial matter, it is awkward to apply the reasoning of

*Nielsen* to the instant case because the defendant-debt collector in that case was a law firm, and the

level of participation the court demanded to avoid creating a false impression under the FDCPA was

colored by that fact.  *Id.* at 635-38.  In evaluating the various acts that the debt collector claimed

amounted to substantial participation, the *Nielsen* court explained that the law firm's involvement

was insufficient to demonstrate that an attorney exercised his "considered professional judgment"

---

[12] Contrary to Plaintiff's assertion (Pl.'s Resp. to Midwestern's Mot. at 12), the court in
*Nielsen* did *not* find the debt collector liable under section 1692j.  *Nielsen*, 307 F.3d at 639-40.
Although the district court had found such liability, the appellate court found it unnecessary to reach
the issue given that the debt collector's lack of involvement in sending the dunning letters subjected
it to liability under section 1692e.  *Id.* at 633, 639-40.

regarding the cardholder's debt. *Id.* This reading of *Nielsen* is supported by the court's holding: "In sum, although an unsophisticated consumer would have construed [the debt-collector's] letter to reflect an attorney's professional judgment that her debt was delinquent and ripe for legal action . . . in fact [the law firm] had made no such assessment." *Id.* at 638; *see also id.* at 635 ("'[I]f a debt collector (attorney or otherwise) wants to take advantage of the special connotation of the word 'attorney' . . . the debt collector should at the least ensure that an attorney has become professionally involved in the debtor's file.'" (quoting *Avila v. Rubin*, 84 F.3d 222, 229 (7th Cir. 1996))). Here, of course, Midwestern is not a law firm, and the South Letter in no way suggests that the decision to transfer a balance to her account was made by an attorney or that the letter was sent with the sanction of an attorney. Accordingly, *Nielsen*'s requirement that an attorney-debt collector's participation must reflect an exercise of professional judgment is inapplicable to this case.

In addition, there are at least two other significant differences from this case and *Nielsen*. First and foremost, the debt collector in *Nielsen* was paid a fixed per-letter fee of $2.45 which the court found to be a "strong[]" suggestion that the creditor "was paying for the marquee value of [debt collector's] name rather than his professional assistance in the collection of its debts." *Id.* at 637. Here, Midwestern was paid commensurate with its involvement: if, through its investigation, Midwestern was able to locate the correct transferee account, it would be paid a percentage of any amount transferred. Second, when the creditor in *Nielsen* referred a set of accounts to the debt collector, the law firm performed only simple batch filtering before sending out the collection letters in bulk. *Id.* at 635-36. In this case, as discussed, Midwestern cannot simply filter the accounts it receives and then send out transfer letters wholesale. Rather, Midwestern must perform an individualized investigation to determine whether it is appropriate to transfer a particular balance

to a particular account.  In Plaintiff's case, this involved, *inter alia*, using Lexis Nexis to determine that she received mail at the Loxley Road address where Kozlowski incurred the debt.  In short, *Nielsen* is unpersuasive on the facts of this case.[13]

Accordingly, the Court concludes that in sending the South Letter, Midwestern did not engage in "flat-rating," and that, as a matter of law, Midwestern did not violate 15 U.S.C. § 1692j.[14]

### D. Consumers Energy is Not a "Debt Collector" Under 15 U.S.C. § 1692a(6)

Arguing in the alternative, Defendant Consumers Energy asserts that even if the South Letter was a demand letter, summary judgment in its favor is nonetheless warranted because it is not a "debt collector" within the meaning of the FDCPA.  (Consumers' Mot. at 7-18.)  Plaintiff disagrees and asserts that Consumers is a "debt collector" under the "false name" provision of 15 U.S.C. § 1692a(6).  (*See generally*, Pl.'s Resp. to Consumers' Mot. at 10-27.)  The Magistrate Judge agreed with Consumers Energy, and in a brief analysis found that "because Midwestern is a separate

---

[13] Plaintiff also asserts that under *Sokolski v. Trans Union Corp.*, 53 F. Supp. 2d 307 (E.D.N.Y. 1999) her section 1692j claim survives summary judgment.  Again, Plaintiff's reliance is misplaced.  In *Sokolski*, unlike here, the flat-rater "had no access to debtor files," "no direct communication with debtors," was paid solely upon the number of letters sent, and the letters directed the recipient to contact the creditor—not the debt collector.  *Id.* at 310-11.

[14] It is unclear whether Plaintiff also alleges that Consumers Energy has violated 15 U.S.C. § 1692j or whether Plaintiff merely alleges that Consumers Energy's role in the alleged flat-rating scheme makes it a "debt collector" under section 1692a(6).  To the extent that it is the former, this claim also fails as a matter of law.  First, the plain language of section 1692j limits liability to the entity that "design[ed], compile[d], *and furnish[ed]*" the letter to a debtor—here, the letter was sent by Midwestern, not Consumers.  *See Mazzei v. Money Store*, 349 F. Supp. 2d 651, 659 n.6 (S.D.N.Y. 2004) (explaining that "[i]f Congress had intended to make creditors liable for participating in flat rating arrangements, it easily could have done so within [section 1692j]; given that Congress has not done so, it seems problematic to impose such liability on creditors through the circuitous route of the false name exception.").  Second, even if Consumers Energy furnished the letter within the meaning of section 1692j, Plaintiff's flat-rating claim against Consumers fails for the same reason it fails against Midwestern: Midwestern actively participated in sending the South Letter and transferring the debt to Plaintiff's account.

company from Consumers Energy and Midwestern sent the November 2 letter to Plaintiff, it is not possible for Consumers Energy to have used another name—the so called 'false name'—in an attempt to collect Plaintiff's debt."  (Report at 12.)   In light of Plaintiff's objection that the Magistrate Judge "completely ignored Plaintiff's analysis of the [f]alse [n]ame exception under the FDCPA" (Pl.'s Obj. at 10-16), the Court will analyze this issue *de novo*.  For the following reasons, at least with respect to the South Letter, the Court agrees with the Magistrate Judge that Consumers Energy is not a "debt collector" under the "false name" exception of the FDCPA.

As a general matter, creditors who are collecting debts owed to them do not fall within the purview of the FDCPA.  Specifically, the definition of "debt collector" provided by the FDCPA begins as follows:

> The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, *debts owed or due or asserted to be owed or due another*.

15 U.S.C. § 1692a(6) (emphasis added); *see also* 15 U.S.C. § 1692a(6)(F).  In enacting a definition that, as a general matter, excludes creditors, Congress reasoned that creditors may have good reason to avoid excessively dunning its debtors:

> Unlike creditors, who generally are restrained by the desire to protect their good will when collecting past due accounts, independent collectors are likely to have no future contact with the consumer and often are unconcerned with the consumer's opinion of them.

S. Rep. No. 95-382, at 2 (1977), *reprinted in* 1977 U.S.C.A.A.N.N. 1695, 1696; *accord Mazzei v. Money Store*, 349 F. Supp. 2d 651, 658 (S.D.N.Y. 2004).

Congress also recognized, however, that where a creditor uses a "false name" to collect its own debts it may abandon restraint—the creditor can hide behind a pseudonym and harass its

delinquent customers without suffering the reputation-related consequences. *See Sokolski v. Trans Union Corp.*, 53 F. Supp. 2d 307, 312 (E.D.N.Y. 1999). Accordingly, the FDCPA's definition of a "debt collector" continues as follows: "Notwithstanding the exclusion provided by [15 U.S.C. § 1692a(6)(F)] the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts." 15 U.S.C. § 1692a(6). It is this latter part of section 1692a(6), the so-called "false name" exception, that Plaintiff claims brings Consumers Energy within the purview of the FDCPA.

A creditor uses a false name "if it 'pretends to be someone else' or uses 'a pseudonym or alias,' or if it owns and controls the debt collector, rendering it the creditor's alter ego." *Mazzei*, 349 F. Supp. 2d at 659 (quoting *Maguire v. Citicorp Retail Servs., Inc.*, 147 F.3d 232, 234-35, 236 (2d Cir. 1998)). "'The triggering of the FDCPA does not depend on whether a third party is in fact involved in the collection of a debt, but rather whether a least sophisticated consumer would have the *false* impression that a third party was collecting the debt.'" *Id.* at 659-60 (quoting *Maguire*, 147 F.3d at 236) (emphasis added); *Nielsen v. Dickerson*, 307 F.3d 623, 633 (7th Cir. 2002) (explaining that under the "false name" exception "a creditor who uses someone else's name so as to suggest to the debtor that a third party is involved in the debt collection process, *when in fact that party is not involved*, can be treated as a 'debt collector' under the FDCPA." (emphasis added)).

In this case, Plaintiff has not produced sufficient evidence for a reasonable jury to find that Consumers Energy masked itself as Midwestern so it could get away with dunning its customers while preserving goodwill. Perhaps recognizing that it was Midwestern, rather than Consumers, that actually mailed the South Letters, Plaintiff argues that Consumers exercised such control over

Midwestern's actions that Consumers, for all intents and purposes, sent the South Letter while deceptively suggesting that it was from Midwestern. (*See* Pl.'s Resp. to Consumers' Mot. 10-11.) In support of this argument, Plaintiff emphasizes that Midwestern "cannot negotiate a settlement with the consumer, cannot offer a payment plan, [and it] creates the transfer letter from instructions from Consumers [E]nergy." (*Id.* at 25; *see also id.* at 15, 27.) However, even taking these facts as established, they are insufficient for a reasonable jury to find that Consumers owns or controls Midwestern such that Consumers Energy falls within the "false name" exception.

In *Mazzei v. Money Store*, the court held that a mortgagee-creditor did not exercise the requisite control over a law firm-debt collector to subject itself to liability under the false name exception. 349 F. Supp. 2d 651 (S.D.N.Y. 2004). Similar to the case at hand, the creditor and debt collector in *Mazzei* had entered into a contractual arrangement wherein the creditor supplied the debt collector with an electronic spreadsheet containing information about the debts owed. *Id.* at 654. Using this spreadsheet, the collector would then generate a batch of demand letters using content that the creditor and debt collector had jointly drafted. *Id.* at 660. "[T]hen, within twenty four hours of receiving the spreadsheet, [the debt collector] sent out the letters." *Id.*

The *Mazzei* court held that the debt collector was not controlled by the creditor for purposes of 15 U.S.C. § 1692a(6). *Id.* at 659-61. In so holding, the court found irrelevant claims that "the breach letters were not really from [the debt collector] in any meaningful sense," and that the debt collector "played little role in handling responses to the breach letters," because those arguments failed to demonstrate that the collector was the creditor's alter ego. *Id.* at 661. The court instead emphasized that the creditor and debt collector were "separate businesses, operating in their own independent financial interests, as exemplified by [a contract] into which the two separate entities

entered." *Id.*

Although not binding authority, *Mazzei* is persuasive. Here, as in *Mazzei*, it is undisputed that Consumers Energy and Midwestern are separate companies, with separate employees, and distinct lines of business. Indeed, it was for this reason that Consumers contracted with Midwestern to aid it in collecting "uncollectible" accounts. Further, once an account was referred, it became Midwestern's responsibility to determine when it was appropriate to transfer an account balance and then notify the transferee of this pending action. Thus, the fact that Consumers may have dictated the content of the South Letter, and that Midwestern did not ultimately collect the transferred debts, does not render Midwestern such a puppet of Consumers Energy that Consumers is a debt collector under the false name exception. *See Mazzei*, 349 F. Supp. 2d at 659-61.

Nor did the South Letter give its recipient the "false impression that a third party was collecting the debt." *See Nielsen*, 307 F.3d at 633; *Mazzei*, 349 F. Supp. 2d at 659-60. It is true that the least-sophisticated consumer, upon receiving the South Letter would likely believe, as the letterhead plainly indicates, that a third-party known as "Midwestern Audit Services, Inc." sent the letter on Consumers Energy's behalf. (*See* Pl.'s Resp. to Consumers' Mot. at 26 ("The reader of the [South Letter] is left with the impression that all actions are being taken by Defendant Midwestern, and not by Defendant Consumers.").) And if the recipient is familiar with debt collection agencies, or otherwise draws the inference, she would conclude that Midwestern is a debt collector. However, these beliefs would be entirely accurate. As discussed, it was Midwestern's independent audits that determined whether and to which accounts debts should be transferred, it was Midwestern that sent the South Letters, it was Midwestern that the recipient was directed to contact, and, if not disputed, it was Midwestern that transferred the balances. In short, a least-sophisticated recipient of the South

Letter may get the impression that a third-party debt collector is responsible for transferring the balance to their Consumers Energy account and sending the corresponding notification—but such a belief is not a false one.[15]

Accordingly, the Court holds as a matter of law that Consumers Energy does not act as a "debt collector" within the meaning of the FDCPA when Midwestern sends Consumers' customers South Letters.

## IV. CONCLUSION

For the foregoing reasons, the Court ADOPTS the Magistrate Judge's Report and Recommendation (Dkt. 49), and OVERRULES Plaintiff's Objection (Dkt. 50). Accordingly, the Court GRANTS Defendant Consumers Energy Co.'s Motion for Summary Judgment (Dkt. 30), Defendant Midwestern Audit Services, Inc.'s Motion for Summary Judgment (Dkt. 38), and DENIES Plaintiff South's Motion to Certify Class (Dkt. 27). Plaintiff's Fair Debt Collection Practices Act claims are DISMISSED WITH PREJUDICE, Plaintiff's state law claims are DISMISSED WITHOUT PREJUDICE, and Defendants' requests for sanctions are DENIED. A judgment shall enter in favor of Defendants.

**IT IS SO ORDERED.**

        s/John Corbett O'Meara
        United States District Judge

Date: December 8, 2010

---

[15] Plaintiff asserts that *Nielsen v. Dickerson*, 307 F.3d 623 (7th Cir. 2002), is persuasive on the issue of whether Consumers Energy used a "false name." However, for many of the same reasons Midwestern is not liable under section 1692j—namely, Midwestern's substantial involvement with the South Letter—the false name analysis in *Nielsen* is not applicable to this case. *Cf. Nielsen*, 307 F.3d at 633 ("Because . . . [the debt collector] was *not* genuinely involved in the effort to collect [the creditor's] debts and that the letter he sent to [the creditor's] debtors was *not* truly 'from' [the collector], we [find] that [the creditor] should be treated as a 'debt collector' for purposes of liability under section 1692e(3) and (10)." (emphases added)).

I hereby certify that a copy of the foregoing document was served upon counsel of record on this date, December 8, 2010, using the ECF system.

<span style="text-decoration: underline;">s/William Barkholz</span>
Case Manager